1
2
3
4

5

6

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

7   JOEL MATTHEW GROVES,

8                            Petitioner,

9           v.

10  RONALD HAYNES,

11                           Respondent.

NO. 1:20-CV-3232-TOR

ORDER DENYING PETITIONER'S
WRIT OF HABEAS CORPUS

12      BEFORE THE COURT is Petitioner Joel Matthew Groves' Petition for Writ

13  of Habeas Corpus.  ECF Nos. 6, 6-1 (also ECF Nos. 1-1, 1-2, 1-3).  Petitioner, a

14  prisoner at Stafford Creek Corrections Center, is proceeding *pro se*.  Respondent is

15  represented by Assistant Attorney General Gregory K. Ziser.  Respondent Ronald

16  Haynes has answered the Petition and filed relevant portions of the state court

17  record.  ECF Nos. 15, 16.  Petitioner filed a Traverse to Respondent's Answer.

18  ECF No. 22.  The Court has reviewed the record and files herein, and is fully

19  informed.  For the reasons discussed below, Joel Matthew Groves' Petition for

20  Writ of Habeas Corpus (ECF No. 6) is **DENIED**.

**BACKGROUND**

On November 30, 2020, Petitioner filed a Petition for Writ of Habeas

Corpus in the Western District of Washington.  ECF No. 1-1.  The Western District

then transferred the case to this District.  ECF No. 4.  Mr. Groves is challenging his

Kittitas County Superior Court jury convictions for assault in the first degree

(count 1), drive by shooting (count 2), and unlawful possession of a firearm in the

first degree (count 4).  ECF Nos. 16-1 at 17–30 (Ex. 2).  The underlying facts and

procedural history, summarized by the Washington Court of Appeals on direct

appeal, are as follows:

> In the summer of 2014, Ryan Smith and Zach Koback began arguing with one another over Facebook. Mr. Smith insulted Mr. Koback's mother, Cathy Sampson. At some point Mr. Smith's friend, DaQwon "Dizzy" Kessay, became involved in the dispute as well.
>
> On July 8, 2014, Mr. Koback was at the lake with his friend Jordan Hanson, his mother, and his mother's boyfriend, Mr. Groves. Mr. Koback told Mr. Groves about how Mr. Smith had insulted his mother. Both Mr. Koback and Mr. Groves were very upset. Mr. Groves told Mr. Koback that he needed to "defend [his] mom's honor" and stand up for her. Report of Proceedings (RP) at 682. Mr. Koback decided he needed to fight Mr. Kessay.
>
> Mr. Groves drove Mr. Koback and Mr. Hanson to Mr. Kessay's apartment so Mr. Koback could fight Mr. Kessay. Only these three were in the car. Mr. Groves drove his gray Mitsubishi while Mr. Koback gave him directions. Mr. Groves told Mr. Koback to "try [his] hardest and to just-do what [he could] to defend [his] mom's honor." RP at 685.
>
> At this time, Mr. Smith, Devon Lowe, Blake Campbell, and Scott Adams were at Mr. Kessay's apartment relaxing and playing

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 2

video games. Mr. Kessay had just arrived home from work and was in the shower. Mr. Adams heard a car pull up outside, and he looked out the window and saw the Mitsubishi. He saw Mr. Koback get out of the passenger side door. Mr. Adams saw the driver was a bald white man in his mid-to-late 40s with stubby facial hair, but Mr. Adams did not recognize him. The man was fidgeting with something in his lap.

Mr. Koback, with Mr. Hanson following, walked up to Mr. Kessay's apartment.  Mr. Koback pounded on the door. He told the people inside the apartment to come outside. Mr. Lowe went and opened the door. He saw Mr. Koback, closed the door, and went and got Mr. Kessay.

Mr. Kessay retrieved a loaded handgun from a drawer. Mr. Kessay cracked the door open and began arguing with Mr. Koback through the crack in the door. Mr. Hanson stood silently behind Mr. Koback. Mr. Kessay did not see anything in either Mr. Koback's or Mr. Hanson's hands. Off to the side of the apartment building, Mr. Kessay noticed a man inside a car who looked busy.

Mr. Koback noticed Mr. Kessay's handgun and then said, "'Dizzy's got a gun.'" RP at 378. Mr. Kessay opened the door wider and saw a portion of the older man, who by then was standing near the car passenger door. Mr. Kessay noticed the man was holding a large black revolver.

At this point, Mr. Lowe heard an older man's voice that he did not recognize say, "'Dizzy, I got something for you.'" RP at 469. Mr. Adams heard an older voice that he did not recognize say, "'Come outside so I can beat your ass.'" RP at 558.

Mr. Kessay slammed the apartment door right as the man holding the gun fired. Mr. Koback heard the gunshot go off behind him. He did not think the shot came from Mr. Hanson's direction. Mr. Hanson grabbed Mr. Koback's sleeve and told Mr. Koback to get to cover. The bullet went through the door and struck the oven inside the apartment. Mr. Smith, Mr. Lowe, Mr. Campbell, and Mr. Adams all ran into the back bedroom or the bathroom.

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

After the first shot rang out, Mr. Kessay opened the door slightly and, without looking outside, fired his handgun at the car. Mr. Koback dove into the back of the car, followed by Mr. Hanson. Once inside the car, Mr. Koback saw Mr. Groves had a revolver. Mr. Groves handed Mr. Koback the revolver and told him to put it inside the speaker in the back seat. Mr. Koback did.

Mr. Groves, Mr. Koback, and Mr. Hanson drove back to Ms. Sampson's house on Highway 97. When they arrived, Mr. Groves told Mr. Koback to hand him the revolver. Mr. Koback did. Ms. Sampson then arrived at the house from the lake and asked what happened. Mr. Groves and Mr. Koback both told her nothing happened. Mr. Groves spent the night at the house.

The police arrived at Mr. Kessay's apartment not long after the shooting. They noticed large dents and a bullet hole in the door, as well as used shell casings on the ground. They also found a bullet fragment underneath the oven.

The police identified Mr. Groves as a possible suspect and issued a press release to the community the next day. Mr. Adams saw the pictures of Mr. Groves in the press release and was 90 to 95 percent sure it was the same person he saw driving the Mitsubishi. The police arrested Mr. Groves. When they arrested him, Mr. Groves had a goatee, a very short buzz cut, sleeve tattoos, and a muscular build.

On July 9, Detective Tim Weed sought a telephone search warrant to search a house located at 2407 N. Ellington Street, where he believed Mr. Groves occasionally stayed. Detective Weed believed a handgun and ammunition might be there. In his affidavit to the court, Detective Weed stated that an eyewitness, Patrick Kennedy, saw Mr. Groves shoot at Mr. Kessay's door. Detective Weed also stated that another officer had attempted to contact Mr. Groves at this address one month before. Detective Weed declared that this other officer "knocked on the door and Groves answered the door." PRP Response, Ex. C, at 4. The court authorized the police to search the 2407 N. Ellington address for "all handguns, all ammunition, all cellular phones and documents showing dominion and control over the residence." PRP Response, Ex. C, at 6.

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

The police executed the search warrant on the 2407 N. Ellington house that day. Inside a room, the police found prescription bottles and mail with Mr. Groves's name on them. The police also found a black bag, which contained spent bullet casings as well as mail addressed to Mr. Groves. The police also found a locked safe underneath a desk. One of the officers popped the lock, and inside the safe were two bullet holsters containing live ammunition. The police collected the spent casings from the black bag and sent them to the Washington State Patrol Crime Laboratory for testing. Mr. Groves never challenged the probable cause for the issuance of the search warrant.

The State charged Mr. Groves with first degree assault, drive-by shooting, felony harassment, and first degree unlawful possession of a firearm.

On August 11, Ms. Sampson asked an acquaintance, Brian Anderson, to haul her trailer full of garbage to the dump. Mr. Anderson went to her house, hooked up the trailer, and was pulling out of the driveway when he noticed the trash on the trailer was not balanced. He began to move the bags of trash around and found a gun among the bags. He called the police.

Detective Weed drove to Ms. Sampson's house and met with Mr. Anderson. Detective Weed recovered the gun from the trash and identified it as a Ruger revolver with a single action, which meant the user needed to cock the hammer before each shot. The revolver contained five live rounds and one spent cartridge. Detective Weed took the revolver back to the station and it was immediately sent to the Washington State Patrol Crime Laboratory for testing.

Around mid-September, Mr. Groves requested an interview with a detective. Detective Cameron Clasen arranged to meet at the jail with Mr. Groves and Mr. Groves's attorney. At the beginning of the interview, Detective Clasen obtained permission from Mr. Groves and his attorney to record the conversation. Detective Clasen then advised Mr. Groves of his *Miranda* rights, which included the phrase, "Anything you say can be used against you in a court of law." RP at

86. Mr. Groves indicated he understood his rights and agreed to speak to Detective Clasen.

Mr. Groves gave Detective Clasen his version of the incident. He told Detective Clasen that he drove Mr. Koback and Mr. Hanson over to Mr. Kessay's apartment in the Mitsubishi Eclipse. He stated that Mr. Koback and Mr. Hanson went to the apartment's door while he remained near the driver's side of the Eclipse. He said a shot was fired and Mr. Koback got back into the Eclipse holding a black revolver. He stated he then drove back to Ms. Sampson's house with Mr. Koback.

During the interview, Mr. Groves concluded that Detective Clasen was not interested in solving the crime, but was only interviewing Mr. Groves so he could "use it against [Mr. Groves] in some fashion." RP at 97. Mr. Groves became upset and agitated. At the end of the interview, Detective Clasen asked Mr. Groves if he had given his statement freely, voluntarily, and without any promises. Mr. Groves responded, "'I don't want to say anything else. I'm talking to a man who thinks I'm guilty. I don't want to say anything more to you.'" RP at 89.

Mr. Groves moved to suppress his interview with Detective Clasen. The trial court found that Mr. Groves made the statements knowingly, voluntarily, and intelligently, and ruled they would be admissible at trial.

In late September, the prosecutor called the crime laboratory and informed them the deoxyribonucleic acid (DNA) analysis on the revolver needed to be done as quickly as possible. The prosecutor called the crime laboratory on a weekly basis to check its progress. An employee at the laboratory eventually told the prosecutor that she could expedite the analysis if she had a reference sample of Mr. Groves's DNA. The prosecutor stated she would attempt to get one.

Mr. Groves's trial was set to begin November 4. The last day of Mr. Groves's speedy trial period was November 10. On October 31, the State moved for an order allowing it to take a sample of Mr. Groves's DNA. At the hearing, the prosecutor informed the court that the laboratory had not yet finished analyzing the DNA on the

revolver. The prosecutor stated the analysis would be faster if the crime laboratory had a sample of Mr. Groves's DNA, as opposed to running the DNA from the revolver through the Combined DNA Index System (CODIS) database. The court ordered Mr. Groves to provide a DNA sample.

On November 3, Mr. Groves moved in limine to exclude any potential DNA evidence from the revolver. He argued that he wished to seek a second opinion on any DNA evidence that might be on the revolver, and that allowing the State to introduce this late-produced evidence would force him to choose between a speedy trial and effective assistance of counsel. The trial court held a hearing on Mr. Groves's motion. The State indicated the DNA analysis would be done either that day or the next day, but the crime laboratory had not started ballistics testing yet. The State asked the court to extend Mr. Groves's speedy trial expiration date in order to allow the crime laboratory to finish analyzing the revolver. Mr. Groves objected. The trial court found that adequate grounds supported the State's motion for a continuance within the cure period and continued the trial to November 12 per CrR 3.3(g).

On November 5, the crime laboratory completed its DNA analysis. Amy Jagmin, the DNA scientist, found a DNA profile on the hammer of the revolver that originated from at least two people. She compared the major profile to the sample from Mr. Groves's buccal swab and concluded they matched. Ms. Jagmin's report also stated:

> The major profile from the hammer of the revolver (QC) was uploaded to and searched against the state level of the Combined DNA Index System (CODIS) database, and no probative matches resulted. The profile will be searched against the national level of the CODIS database at a future date. If any probative matches occur, an additional report will be provided.

SAG Attach. B at 2.

The revolver was then immediately sent to a ballistics analyst, who completed ballistics testing on November 7. The ballistics analyst

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 7

concluded the bullet that was underneath Mr. Kessay's oven in the apartment came from the same revolver.

On November 7, the State provided the DNA and ballistics analyses to Mr. Groves. Mr. Groves again moved to suppress the DNA evidence on the basis that he needed time to have the DNA on the revolver retested. The trial court denied Mr. Groves's motion, but ordered the State to give Mr. Groves "complete access" to the DNA and ballistics analysts up until the day the analysts would testify at trial. RP at 171. The trial court also found that the State had made diligent efforts to obtain the evidence.

While awaiting trial, Mr. Groves made three telephone calls from jail to his new girlfriend. During the first call, he told her that, "'Even if I had a gun nobody got hurt.'" RP at 1160. During the second call, he said, "'This all happened so goddam [sic] fast, you know what I mean, it just happened fast. I'm thinking that I'm going (inaudible) handle a fistfight or something, you know?'" RP at 1161. During the last call, he said, "'I could have just went ahead and let (inaudible) shoot Zack .... That's what's I should have done. I should have just left the kid (inaudible) on his goddam [sic] own-let this happen.'" RP at 1161-62.

At trial, in addition to calling Mr. Koback, Mr. Hanson, and everyone who was inside the apartment, the State produced another witness: Patrick Kennedy, who was friends with Mr. Koback and Mr. Hanson. Mr. Kennedy was riding his bike to Mr. Kessay's apartment on the night of the shooting. When he arrived at the apartment building, he saw Mr. Koback banging on Mr. Kessay's door and yelling. He saw Mr. Hanson standing just off Mr. Koback, to the side of the door.

Mr. Kennedy testified he also saw an older bald man with sleeve tattoos who he did not recognize. This man had a revolver. Mr. Kennedy heard the man say, "'Oh, I got something for you.'" RP at 591. After the older man said this, Mr. Kennedy ran away. He then heard a gunshot. Mr. Kennedy testified the older man got into the driver's side of the car, and Mr. Koback and Mr. Hanson got in on the passenger's side. They then left. Finally, Mr. Kennedy testified that

the police later showed him a photo lineup and he was 90 percent sure Mr. Groves was the shooter.

The State also called Detective Clasen. Detective Clasen testified about his interview with Mr. Groves in the jail.

The State also called Kathy Geil, the firearm and toolmark examiner at the Washington State Patrol Crime Laboratory. Ms. Geil testified she received the Ruger revolver, the spent casings, and the bullet fragment. She fired test shots from the revolver and compared those test shots to the spent casings and the bullet fragments she had received. She determined the bullet fragment that was under Mr. Kessay's oven came from the Ruger revolver. She also determined the spent casings from the black bag in Mr. Groves's bedroom also came from the revolver.

The State also called Ms. Jagmin, the DNA scientist at the Washington State Patrol Crime Laboratory who tested the Ruger revolver. Ms. Jagmin testified that she tested the revolver's grip, cylinder, and trigger, and found at least three people's DNA on them, but because it was a low level and it was a complex mixture, she could not do any further analysis or comparisons.

However, Ms. Jagmin testified she was able to obtain a robust profile on the revolver's hammer, which the user needed to pull back to cock the gun. She determined there was a mixture of two people's DNA on the hammer. Of these two people, there was "one main person and then a trace of somebody else." RP at 1006. She was able to compare the major profile to Mr. Groves's reference sample and concluded they matched. She was not given anyone else's DNA to compare.

The jury found Mr. Groves guilty on all four counts. It also returned special verdicts finding Mr. Groves was armed with a firearm at the time he committed the first degree assault, drive-by shooting, and harassment.

On the first degree assault count, the trial court sentenced Mr. Groves to 279 months' confinement plus a 60-month firearm enhancement. On the drive-by shooting count, the court sentenced Mr.

1

2

3

4

Groves to 101 months' confinement plus a 36-month firearm enhancement. On the harassment count, the court sentenced Mr. Groves to 55 months' confinement plus an 18-month firearm enhancement. On the unlawful possession count, the trial court sentenced Mr. Groves to 101months. The court ran all the sentences concurrently except for the corresponding firearm enhancements, which it ran consecutively to the rest of the sentence.

5

6

7

8

Mr. Groves appealed. Mr. Groves later filed a CrR 7 .8 motion to dismiss the case, arguing the search and arrest warrants were defective and he received ineffective assistance of counsel. The trial court transferred Mr. Groves's motion to this court for consideration as a PRP pursuant to CrR 7.8(c)(2). This court consolidated Mr. Groves's PRP with his direct appeal.

9

ECF No. 16-1 at 33–45 (Ex. 3) (footnote omitted).

10

11

12

13

14

15

16

The Washington Court of Appeals affirmed Petitioner's convictions for first degree assault, drive-by shooting, and first degree unlawful possession of a firearm. *Id*. at 70. It accepted the State's concession that the trial court erred when it imposed the firearm enhancement to the drive-by shooting conviction. *Id*. It reversed Petitioner's conviction for felony harassment and remanded for judgment of dismissal with prejudice for the felony harassment count and resentencing consistent with its opinion. *Id.*

17

18

19

Petitioner filed a petition for review in the Washington Supreme Court. ECF No. 16-2 at 2–136 (Ex. 16). On November 8, 2017, the Supreme Court denied review without comment. ECF No. 16-2 at 138 (Ex. 17).

20

In March 2018, Petitioner filed a second personal restraint petition in the Washington Court of Appeals, ECF No. 16-2 at 180-321 (Ex. 19) and another CrR 7.8 motion in the superior court, ECF NO. 16-2 at 322-424 (Ex. 20.) Eventually, both were transferred to the Washington Supreme Court where the commissioner rejected and dismissed both claims on April 14, 2020.  ECF No. 16-3 at 373-380 (Ex. 25).  A certificate of finality issued on the commissioner's ruling on June 3, 2020.  ECF No. 16-3 at 381-382 (Ex. 26).

Petitioner filed this federal 28 U.S.C. § 2254 habeas petition (ECF No. 1-1) on November 30, 2020 (signed November 20, 2020), alleging three grounds for relief:

> (1) Groves' right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution was violated when the State and its agencies destroyed material exculpatory evidence and then suppressed this fact.

> (2) The State's omission of the "great bodily harm" element in its to-convict jury instructions, along with the vague definition of assault, relieved the State of its burden of proving beyond a reasonable doubt that Groves committed first degree assault.

> (3) Trial counsel's failure to investigate and present the court with easily ascertainable facts denied Groves the effectiveness of counsel. Counsel's failure to subject the State's case to meaningful adversarial testing left Groves without counsel at a critical stage in the proceedings and prejudiced his right to a fair trial.

ECF No. 6-1 at 21-41 (claim 1), 42-54 (claim 2), 54-62 (claim 3).

Respondent concedes that Petitioner has exhausted his state remedies on these three claims pursuant to 28 U.S.C. § 2254(b).  ECF No. 15 at 15.

## DISCUSSION

A court will not grant a petition for a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court proceedings unless the petitioner can show that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Section 2254(d) sets forth a "highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation omitted).

## I.    No Evidentiary Hearing Required

Petitioner seeks an evidentiary hearing to propound a number of questions concerning the DNA testing for which he claims are disputed material facts.  ECF No. 22 at 7.  28 U.S.C. § 2254, requires the Court to consider the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2).  As to factual determinations, the Supreme Court has instructed that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determinations of the state court were reasonable.  *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on *de novo* review, subject to the limitations of § 2254(e)(2).").  Two separate statutory subsections govern a federal court's review of state court factual findings:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007).  Importantly, a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. at 473.

1    Accordingly, this Court finds no evidentiary hearing is required in light of

2    the evidence presented in the state court proceeding and the relevant and material

3    facts upon which this Court relies.

4    **II.    Standard of Review**

5         A rule is "clearly established Federal law" within the meaning of section

6    2254(d) only if it is based on "the holdings, as opposed to the dicta, of [the

7    Supreme Court's] decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014)

8    (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)).  A state court's decision is

9    contrary to clearly established Supreme Court precedent "if it applies a rule that

10   contradicts the governing law set forth in [Supreme Court] cases or if it confronts a

11   set of facts that are materially indistinguishable from a decision of [the Supreme

12   Court] and nevertheless arrives at a result different from [Supreme Court]

13   precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (internal quotation marks

14   omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).  The state

15   court need not cite to the controlling Supreme Court precedent, nor need it even be

16   aware of the relevant case law, "so long as neither the reasoning nor the result of

17   the state-court decision contradicts them." *Id.*  "[A]n unreasonable application of"

18   clearly established federal law is one that is "objectively unreasonable, not merely

19   wrong; even clear error will not suffice." *White*, 572 U.S. at 419 (internal

20   quotation marks and citation omitted).  Of utmost importance, circuit precedent

may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam).

In order to obtain a writ of habeas corpus, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White*, 572 U.S. at 419-20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Under the harmless error standard of review adopted by the Supreme Court, even if a reviewing court finds constitutional error, the challenged error must have caused "actual prejudice" or had "substantial and injurious effect or influence" in determining the jury's verdict in order for the court to grant habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

> If [the section 2254(d)] standard is difficult to meet, that is because it was meant to be …. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

1  *Harrington*, 562 U.S. at 102–03 (citations omitted).

2      The petitioner bears the burden of showing that the state court decision is

3  contrary to, or an unreasonable application of, clearly established precedent.  *See*

4  *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).  In conducting its habeas

5  review, a federal court looks "to the last reasoned decision of the state court as the

6  basis of the state court's judgment."  *Merolillo v. Yates*, 663 F.3d 444, 453 (9th

7  Cir. 2011) (citation omitted).  A rebuttable presumption exists: "Where there has

8  been one reasoned state judgment rejecting a federal claim, later unexplained

9  orders upholding that judgment or rejecting the same claim rest upon the same

10  ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

11  **III.    Discussion**

12      **Claim 1:  *Brady* Violation**

13      Petitioner contends that the State violated *Brady v. Maryland* when it

14  "destroyed material exculpatory evidence and then suppressed this fact."  ECF No.

15  6-1 at 21.  In summary, Petitioner contends that: the testing of the hammer of the

16  firearm revealed DNA from at least two people; the testing of the hammer for

17  DNA consumed the sample, leaving nothing further to test; the major DNA profile

18  was uploaded and searched against the Combined DNA Index System (CODIS)

19  database resulting in no probative matches; and the State suppressed the fact that

20  the sample had been destroyed in testing.  See ECF No. 22 at 9-15.  Petitioner cites

1   to but overlooks the critical fact that testing the hammer of the firearm for DNA

2   resulted in forensic test results showing a "major male profile was present and

3   matched the DNA typing profile obtained for Joel M. Groves."  ECF No. 1-2 at 2.

4   Only after this finding does the report reflect no other probative matches in CODIS

5   resulted.  *Id*.  This information was provided to the defense before trial.  See ECF

6   No. 16-1 at 115.  Testimony at trial revealed that the testing of the firearm revealed

7   DNA for "at least three people" on the grip, the trigger and the cylinder and "at

8   least two people" on the hammer.  *Id*.

9        "A *Brady* violation occurs when the government fails to disclose evidence

10  materially favorable to the accused."  *Youngblood v. W. Viriginia*, 547 U.S. 867,

11  869 (2006) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  A court should

12  find that evidence is material "only if there is a reasonable probability that, had the

13  evidence been disclosed to the defense, the result of the proceeding would have

14  been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "A reasonable

15  probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

16  (internal quotation marks omitted).  "To state a claim under *Brady*, the plaintiff

17  must allege that (1) the withheld evidence was favorable either because it was

18  exculpatory or could be used to impeach, (2) the evidence was suppressed by the

19  government, and (3) the nondisclosure prejudiced the plaintiff."  *Smith v. Almada*,

20  640 F.3d 931, 939 (9th Cir. 2011) (citation omitted).  A *Brady* violation does not

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 17

exist in a case in which the allegedly suppressed evidence is known by the defense. *See United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) ("Since suppression by the Government is a necessary element of a *Brady* claim, if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails.") (citations omitted).

Here, Petitioner seems to assert that his trial counsel did not know that the sample had been consumed in testing. However, the results of the testing showed no less than two other person's DNA on the firearm and this was testified to at trial. An issue at trial was the identity of the shooter. Whether the sample was consumed or not, whether that was known by the defense or not, does not quantifiably show who the shooter of the firearm was because the test results showed that at least three person's DNA were on the firearm. Petitioner shows no prejudice, let alone material exculpatory evidence.

Here, the state court found that Petitioner "fails to demonstrate factually that the State failed to preserve material exculpatory evidence or that it acted in bad faith; his claim is based on his speculation as to the nature of the DNA evidence consumed in testing. Because there is no factual basis for this claim, it is also frivolous." ECF No. 16-3 at 379.

//

//

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 18

Accordingly, this Court finds the state court's conclusions were neither an unreasonable determination of the facts nor an unreasonable application of the clearly established constitutional law as set forth by *Brady*.

**Claim 2:   Challenge to Jury Instruction**

Petitioner contends that the omission of the "great bodily harm" element in the jury instructions, along with a vague definition of assault, relieved the state of its burden of proving he committed first degree assault beyond a reasonable doubt. ECF No. 6-1 at 42.  Accordingly, he contends that his due process rights were violated.  *Id*. at 54.

Petitioner was charged with assault in the first degree in violation of RCW 9A.36.011.  *See* Amended Information at ECF No. 16-3 at 715.  In 2014, RCW 9A.36.011 provided:

> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
>     (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
>     (b) Administers, exposes, or transmits to or causes to be taken by another, poison, the human immunodeficiency virus as defined in chapter 70.24 RCW, or any other destructive or noxious substance; or
>     (c) Assaults another and inflicts great bodily harm.
> (2) Assault in the first degree is a class A felony.

RCW 9A.36.011 (eff. 1997).  The jury was instructed that:

> To convict the defendant of the crime of assault in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>     (1) That on or about July 8, 2014, the defendant assaulted

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS ~ 19

Da'Qwon Kessay;

(2) That the assault was committed with a firearm;

(3) That the defendant acted with intent to inflict great bodily harm; and

(4) That this act occurred in the State of Washington.

. . . .

ECF No. 16-3 at 831.  "Assault" was defined in Instruction No. 6.  *Id*. at 827.

"Great bodily harm" was defined in Instruction No. 7.  *Id*. at 828.

Petitioner misreads the operative statute and the necessary elements of first degree assault and contends that in order to be convicted he had to have inflicted great bodily harm, rather than merely having the intent to inflict great bodily harm. No error has been shown, let alone constitutional error.  The trial court also properly defined assault according to Washington law.  Again, no error has been shown let alone constitutional error.

Petitioner's argument repeatedly relies on federal statutes and federal case law interpreting those federal statutes.  That authority has no relevance to the issues before this Court.

**Claim 3: Ineffective Assistance of Counsel**

A defendant in criminal proceedings has a constitutional right to effective assistance of counsel.  U.S. Const. amend. VI.  A defendant asserting violation of his constitutional right to effective assistance of counsel must demonstrate the following:  (1) "that counsel's representation fell below an objective standard of

reasonableness," and (2) "that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kimmelman v. Morrison*, 477 U.S. 365, 374–75 (1986) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).  Regarding the first prong, a "tactical decision about which competent lawyers might disagree" does not qualify as objectively unreasonable.  *Bell v. Cone*, 535 U.S. 685, 702 (2002). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  *Strickland*, 466 U.S. at 689. Additionally, habeas courts must be deferential not only to the decisions of defense counsel, but also to the decisions of the state courts as required under 28 U.S.C. § 2254(d)(1).  *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (doubly deferential judicial review applies to a *Strickland* claim evaluated under the § 2254).  Moreover, the Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Id*.

Here, Petitioner alludes to the following failures of his counsel: 1) failure to obtain documents to substantiate the state's dilatory DNA testing which could support suppression and establish a violation of his right to a speedy trial; 2) failure to get to the bottom of allegedly contradictory results of the DNA testing showing

1    a match of the DNA on the hammer of the firearm but test results showing no

2    match in CODIS; 3) failure to use an independent forensic expert; 4) failure to

3    challenge the search of the Ellington Street address; 5) failure to raise a *Brady*

4    claim; 6) failure to submit proposed jury instructions; and 7) failure to seek DNA

5    from other suspects.  ECF No. 6-1 at 59-62.

6        Petitioner has not shown prejudice with respect to any of his allegations.

7    Petitioner's allegations 2, 3, 5, 6 and 7 are accompanied by no argument or facts to

8    support his assertions.  Accordingly, they are denied.  Other than broad assertions,

9    he has not shown that there is any reasonable probability that, but for counsel's

10   unprofessional errors, the result of the proceeding would have been different.

11       With respect to the allegation of dilatory DNA testing (allegation number 1),

12   Petitioner makes no showing that suppression would be the remedy for delayed

13   laboratory analysis.  Before trial, counsel filed a motion to exclude late-produced

14   evidence and it was denied.  *See* ECF No. 16-1 at 67-68; 108.

15       With respect to the search of the Ellington Street address (allegation number

16   4), despite Petitioner's contention to the contrary, the Court of Appeals found a

17   sufficient nexus between the evidence sought and his room at that address thereby

18   validating the search warrant.  ECF No. 16-1 at 66.  Accordingly, the Court of

19   Appeals held that Petitioner failed to demonstrate defense counsel performed

20   deficiently by not challenging the search warrant.  *Id*.

Petitioner's repeated, broad assertions that counsel failed to subject the state's case to meaningful adversarial testing also fails for lack of demonstrated prejudice. On this issue in reply, Petitioner contends the two most critical issues were counsel's failure to challenge the search warrant and failure to challenge the forensic conclusions. ECF No. 22 at 30. As explained above, the Court of Appeals found a sufficient nexus between the evidence sought and Petitioner's room at that address to support the issuance of the search warrant. ECF No. 16-1 at 66. As to the forensic conclusions, the DNA evidence established that Petitioner touched the firearm at some time, but it did not establish that he was the shooter. Indeed, because the DNA evidence showed traces of three persons, it allowed Petitioner the opportunity to argue that he was not the shooter. Petitioner has shown no prejudice.

## IV.   Conclusion

Based on the foregoing, this Court finds that the state court's rejection of Petitioner's claims was neither contrary to nor involved an unreasonable application of clearly established constitutional law as determined by the United States Supreme Court, nor an unreasonable determination of the facts in light of the evidence that was presented in the state court proceeding. Thus, habeas relief is not warranted on these claims.

//

## V.    Certificate of Appealability

A petitioner seeking post-conviction relief under section 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A COA may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

This Court concludes that Petitioner is not entitled to a COA because he has not demonstrated that jurists of reason could disagree with this Court's resolution of his constitutional claims or could conclude that any issue presented deserves encouragement to proceed further.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Petitioner's Petition for Writ of Habeas Corpus (ECF No. 6) is **DENIED**.

2. Any appeal taken by Petitioner of this matter would not be taken in good faith as he fails to make a substantial showing of the denial of a constitutional right.  Accordingly, a certificate of appealability is denied.

1    The District Court Executive is directed to enter this Order and Judgment

2  accordingly, furnish copies to the parties, and **CLOSE** the file.

3    **DATED** May 21, 2021.



THOMAS O. RICE
United States District Judge